rFactr, Inc. v. McDowell, 2023 NCBC 8.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

RFACTR, INC., RICHARD
BRASSER, and GREG GENTNER,

                Plaintiffs,

v.

CHRIS MCDOWELL and
CAROLINE MCDOWELL,

                Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 12299

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE
OR PRECLUDE RELIANCE ON
CERTAIN STATEMENTS OF THE
DECLARATION OF LUIS GOMEZ**

1.     **THIS MATTER** is before the Court upon Defendants Caroline McDowell ("Caroline") and Chris McDowell's ("Chris") (together, "Defendants" or the "McDowells") Motion for Summary Judgment on Plaintiffs' Affirmative Claims (the "SJ Motion"), (ECF No. 202), and Defendants' Motion to Strike or Preclude Reliance on Certain Statements of the Declaration of Luis Gomez ("Gomez"), (the "Motion to Strike"), (ECF No. 215), (together, the "Motions") in the above-captioned case.

2.     After considering the Motions, the briefs and related materials submitted in support of and in opposition to the Motions, and the arguments of counsel at the hearing on the Motions, the Court hereby **GRANTS in part** and **DENIES in part** each Motion.

*Lincoln Derr PLLC, by Sara R. Lincoln and Phoebe Norton Coddington, for Plaintiffs Richard Brasser and Greg Gentner.*

*James, McElroy & Diehl, P.A., by John R. Buric and John R. Brickley, for Plaintiff rFactr, Inc.*

*Rosenwood, Rose & Litwak, PLLC, by Erik M. Rosenwood, for Defendants Caroline McDowell and Chris McDowell.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.   Factual Background

3.    This litigation arises out of Caroline's October 2017 telephone call to Jackson National Life Insurance Company ("Jackson National"), in which Plaintiffs allege that Caroline falsely represented that Plaintiff rFactr, Inc. ("rFactr" or the "Company"), a company with outstanding Internal Revenue Service ("IRS") liabilities and with which Jackson National was negotiating a contract, was financially unstable.  Soon after the call, Jackson National informed rFactr that it no longer wished to pursue negotiations or enter into a contract with the Company.  Plaintiffs subsequently filed suit against the McDowells, asserting claims based on Caroline's call and contending that the call was the sole reason that Jackson National did not enter a contract with rFactr.

4.    The McDowells have asserted counterclaims in response, alleging, among other things, that Plaintiffs misrepresented the Company's financial condition to induce the McDowells' investment in the Company and that Plaintiffs Richard Brasser ("Brasser") and Greg Gentner ("Gentner") breached their fiduciary duties to the McDowells by misrepresenting rFactr's financial condition, paying themselves excessive and unreasonable salaries, and otherwise diverting corporate resources for their personal benefit.

5. The Court does not make findings of fact when deciding a motion for summary judgment. The Court previously considered and ruled upon three motions for summary judgment in this action on 8 December 2020 (the "2020 Opinion").[1] Because the parties rely extensively upon the prior summary judgment record on the current Motions, the Court incorporates by reference the factual and procedural background set forth in paragraphs 6–19 of the 2020 Opinion to provide context for the Court's analysis and ruling here.

6. Of particular relevance, it is undisputed that Brasser and Gentner were executive officers, directors, and shareholders of rFactr and ran its day-to-day operations.[2] Chris sat on rFactr's board of directors beginning in 2015, but his wife, Caroline, did not.[3]

---

[1] *See rFactr, Inc. v. McDowell*, 2020 NCBC LEXIS 144 (N.C. Super. Ct. Dec. 8, 2020) (resolving the following motions: (i) Brasser and Gentner's Motion for Summary Judgment on Plaintiffs' Affirmative Claims, (ECF No. 76); (ii) Brasser and Gentner's Motion for Summary Judgment on Defendants' Counterclaims, (ECF No. 78); (iii) rFactr's Motion for Summary Judgment on rFactr's Claims and Defendants' Counterclaims, (ECF No. 84); and (iv) Defendants' Amended Motion to Strike and/or Preclude Reliance on Affidavit of Luis Gomez, (ECF No. 96)).

[2] (Aff. Richard Brasser, dated June 1, 2020, at ¶¶ 5–6 [hereinafter "Brasser Aff."], ECF No. 79; Aff. Greg Gentner, dated June 1, 2020, at ¶¶ 5–6 [hereinafter "Gentner Aff."], ECF No. 80.)

[3] (Pls. Richard Brasser and Greg Gentner's Br. Supp. Mot. Summ. J. Pls.' Affirmative Claims [hereinafter "Officers' 2020 Br."] Ex. 1, Dep. James Christopher McDowell, dated June 4, 2019, at 15:21–16:1 [hereinafter "Chris Dep."], ECF No. 82.1.) Excerpts of Chris's deposition appear across various docket entries in this action. Therefore, the Court will provide a docket number each time it cites to his deposition.

7.      While Chris sat on the board, he often worked from home, and had business calls on speakerphone that Caroline could sometimes hear.[4]  Caroline also had access to Chris's email account, and frequently read his work emails without his knowledge.[5]

8.      In 2015, rFactr began negotiations for a multi-year software license with Jackson National that continued into the autumn of 2017.[6]  Plaintiffs contend, and Defendants dispute, that by October 2017, rFactr and Jackson National had reached an agreement on services and pricing, and the finalization of a contract awaited only a review by Jackson National's legal department.[7]

9.      Before and during these negotiations, it is undisputed that rFactr had incurred significant losses and struggled to pay its creditors or business expenses,[8] and that the IRS had filed sizable tax liens against the Company.[9]

---

[4] (Chris Dep. 14:2–15:4, ECF No. 82.1.)

[5] (Chris Dep. 13:11–14:1, ECF No. 82.1; Officers' 2020 Br. Ex 2, Dep. Caroline McDowell, dated June 3, 2019, at 146:2–13 [hereinafter "Caroline Dep."], ECF No. 82.2.)  Excerpts of Caroline's deposition also appear across several different docket entries in this action.  The Court will therefore provide a docket number each time it cites to her deposition.

[6] (Aff. Chris McDowell, dated June 29, 2020, at ¶ 18 [hereinafter "Chris Aff."], ECF No. 94; Gentner Aff. ¶¶ 14, 20.)

[7] (Brasser & Gentner's Mem. Law Opp'n Defs.' Mot. Summ. J. [hereinafter "Officers' Opp'n Br."] Ex. 8, Decl. Luis Gomez, dated Dec. 19, 2022 at ¶¶ 6–8 [hereinafter "Gomez Decl."], ECF No. 209.9.)

[8] (*See* Chris Aff. Ex. A.5 at CONFIDENTIAL_MCDOWELL_PRODUCTION_000000533–37 [hereinafter "rFactr Investor Update"], ECF No. 94.5.)

[9] (Gentner Aff. ¶¶ 11–12; Chris Aff. ¶ 17.)  Brasser and Gentner did not disclose rFactr's IRS liability to its board members until June 2017, when rFactr owed over $900,000 to the IRS, and to rFactr's investors until August 2017, when rFactr owed approximately $720,000. (Chris Aff. ¶¶ 14–16; rFactr Investor Update at CONFIDENTIAL_MCDOWELL_PRODUCTION_000000533.)

10.     On 26 October 2017, Caroline placed the phone call to Jackson National that lies at the center of Plaintiffs' claims (the "Call").  It is undisputed that she posed as a former rFactr employee named "Susan," and that she made several representations about rFactr to Jeffrey Mitchell ("Mitchell"), a senior human resources consultant for Jackson National, including that rFactr and its owners were in financial difficulty, that rFactr was in trouble with the IRS, that rFactr's owners were being investigated for arson, and that rFactr's owners had withdrawn their children from school and were moving out of the country.[10]  Mitchell reported the call to Jackson National's in-house counsel.[11]

11.     On the following day, 27 October 2017, Luis Gomez ("Gomez"), Jackson National's Vice President of Marketing and Digital Strategy and its point of contact with rFactr concerning the software license negotiations,[12] emailed rFactr stating that Jackson National had "decided to move in another direction" and that it would discontinue its contract negotiations with rFactr.[13]  Brasser initially suspected that

---

[10] (*See* Officers' 2020 Br. Ex. 3, Audio Recording Phone Call, ECF No. 82.3; Caroline Dep. 194:15–25, 196:3–7, ECF No. 82.2; Defs.' Br. Opp'n Mot. Summ. J. by rFactr Ex 2, Dep. Jeffrey Mitchell, dated May 30, 2019, at 16:7–11 [hereinafter "Mitchell Dep."], ECF No. 106.2.)  Like the depositions of the McDowells, the deposition of Jeffrey Mitchell appears in multiple docket entries in this action.  However, his deposition appears in full at ECF No. 106.2, so each citation to his deposition is to that docket entry.

[11] (Mitchell Dep. 27:10–17.)

[12] (Gentner Aff. ¶ 28; Gomez Decl. ¶¶ 3–4.)

[13] (Gentner Aff. ¶ 29.)

Jackson National had ended negotiations because it had discovered rFactr's tax liens.[14] Brasser and Gentner did not learn of the Call until months afterwards.[15]

B. Procedural History

12. In its 2020 Opinion, the Court denied (i) Brasser and Gentner's motion for summary judgment on their claim for defamation; (ii) Brasser and Gentner's motion for summary judgment against Chris's counterclaims for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation; and (iii) rFactr's motion for summary judgment on its claims for tortious interference with prospective economic advantage, breach of fiduciary duty, and unfair and deceptive trade practices and on Chris's counterclaims for breach of contract and constructive fraud. In that same opinion, the Court granted (i) Brasser and Gentner's motion for summary judgment against Caroline's counterclaims for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation; and (ii) rFactr's motion for summary judgment against Caroline's breach of contract and constructive fraud counterclaims and the McDowells' shareholder inspection counterclaim. *See generally rFactr, Inc.*, 2020 NCBC LEXIS 144.

13. On 31 March 2021, the Court noticed a jury trial to commence on 11 July 2022 on all remaining claims, specifically: (i) Brasser and Gentner's claim against both Defendants for slander per se; (ii) rFactr's claims against both Defendants for

---

[14] (*See* Brasser Aff. Ex. 5 at CONFIDENTIAL_MCDOWELL_PRODUCTION_000001158, ECF No. 79.5.)

[15] (Brasser Aff. ¶ 30; Gentner Aff. ¶ 30.)

tortious interference with prospective economic advantage and unfair and deceptive trade practices and against Chris for breach of fiduciary duty; and (iii) Chris's counterclaims against Brasser and Gentner for breach of fiduciary duty, constructive fraud, and fraudulent misrepresentation and against rFactr for breach of contract and constructive fraud.[16] The Court subsequently continued the trial to 5 December 2022.[17]

14. On 2 August 2022, the Court entered an Order reopening the discovery period in this action through and including 17 October 2022 for the limited purpose of affording Defendants the opportunity to conduct discovery on witnesses and documents that Plaintiffs failed to disclose and produce until 13 May 2022 (the "Late Information"). The Late Information was produced two years after the close of discovery, over three years after Defendants served discovery requests seeking this information, and only six weeks prior to the then-scheduled trial.[18]

15. On 3 November 2022, Defendants moved to amend the Case Management Order (the "CMO"), (ECF No. 22), to permit Defendants to move for summary judgment based on the Late Information and the discovery related to that information

---

[16] (Notice Jury Trial, ECF No. 127.)

[17] (Notice Jury Trial, ECF No. 170.)

[18] (*See* Order Defs.' Mot. in Lim. Exclude Late-Disclosed Information, ECF No. 183.)

("New Discovery").[19]  The Court granted Defendants' motion on 16 November 2022 (the "CMO Amendment Order")[20] and continued the jury trial to 13 February 2023.[21]

16.  The CMO Amendment Order specifically provided that Defendants were permitted to file "a post-discovery dispositive motion based on the Late Information and the New Discovery" and directed that the motion "shall not be primarily based on information Defendants acquired before the close of discovery[.]"[22]  The Order further provided that "Defendants may reference and rely upon such information if, in fairness, the Late Information, the New Discovery, and information Defendants acquired before the close of discovery should be considered together for purposes of Defendants' motion[.]"[23]  The Order also made clear that its entry was "without prejudice to Plaintiffs' right to oppose Defendants' anticipated summary judgment motion on grounds that it does not comply with the restrictions[.]"[24]

17.  As permitted by the CMO Amendment Order, Defendants filed the SJ Motion on 17 November 2022, seeking summary judgment on all of Plaintiffs' claims. After full briefing, the Court held a hearing on the SJ Motion on 9 January 2023, at

---

[19] (*See* Mot. Sanctions and Am. Case Management Order, ECF No. 186.)

[20] (Order Granting Mot. Am. Case Management Order [hereinafter "CMO Amendment Order"], ECF No. 197.)

[21] (Notice Jury Trial, ECF No. 201.)

[22] (CMO Amendment Order ¶ 10(a).)

[23] (CMO Amendment Order, ¶ 10(a).)

[24] (CMO Amendment Order, ¶ 10(b).)

which all parties were represented by counsel (the "Hearing").  The SJ Motion is now ripe for resolution.

## II.

## LEGAL STANDARD

18.    Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).  An issue is genuine if it is "supported by substantial evidence," and "an issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action[.]"  *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (cleaned up).  All the "[e]vidence presented by the parties is viewed in the light most favorable to the non-movant."  *Summey v. Barker*, 357 N.C. 492, 496 (2003).

19.    The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact."  *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002).  "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial."  *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).  "The nonmoving party, in [its] response, 'must set forth specific facts showing that there is a genuine issue for trial.  If he does not so respond, summary judgment,

if appropriate, shall be entered against him.'" *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 92, at \*7 (N.C. Super. Ct. Oct. 3, 2017) (quoting N.C. R. Civ. P. 56(e)).

III.

ANALYSIS

20. Before proceeding to the substance of the SJ Motion, the Court addresses two threshold matters: Defendants' alleged failure to comply with the CMO Amendment Order and Defendants' Motion to Strike.

A. <u>Defendants' Compliance with the CMO Amendment Order</u>

21. Each Plaintiff claims that Defendants have failed to limit the SJ Motion to the Late Information and the New Discovery as required under the CMO Amendment Order and instead have based the motion primarily on information Defendants acquired before the close of discovery.[25] Having carefully considered the matter, the Court, in the exercise of its discretion, in the interests of judicial economy, and in the circumstances of this case, shall assume without deciding that Defendants have complied with the CMO Amendment Order and proceed to consider the parties' arguments on the SJ Motion's merits, which likely anticipate similar if not identical arguments that they will make on directed verdict at trial. *See, e.g.*, *In re Southeastern Eye Center-Pending Matters*, 2022 NCBC LEXIS 103, at \*5–6 (N.C. Super. Ct. Feb. 17, 2022) (noting a trial court's "inherent authority" to manage its

---

[25] (Officers' Opp'n Br. 2, ECF No. 209; rFactr's Mem. Law Opp'n Defs.' Mot. Summ. J. Pls.' Affirmative Claims 2–4 [hereinafter "rFactr Opp'n Br."], ECF No. 210.)

docket). The Court therefore, in its discretion, overrules Plaintiffs' challenge to the scope of the SJ Motion.

B. <u>Defendants' Motion to Strike</u>

22. Defendants move to strike the declaration of Luis Gomez (the "Gomez Declaration")[26] filed in opposition to the SJ Motion on grounds that Gomez offers unauthorized statements on behalf of Jackson National, that he lacked personal knowledge of the matters in his declaration, and that his statements constitute inadmissible hearsay.[27] It is axiomatic that evidence contained in affidavits or declarations that would be inadmissible at trial must be stricken and cannot be considered by the Court in rendering summary judgment. *Hammer v. Hammer*, 179 N.C. App. 408, 411 (2006).

23. The Court first turns to Defendants contention that Gomez offers unauthorized statements on behalf of Jackson National in paragraphs 5–9 of his declaration.[28] A close review of the declaration shows that Gomez does not purport to speak for Jackson National in the declaration, and all his statements concern his personal involvement in negotiations with rFactr.[29] Defendants point to *McCallum*

---

[26] (Gomez Decl.)

[27] (*See generally* Defs.' Br. Supp. Mot. Strike or Preclude Reliance Certain Statements Decl. Luis Gomez [hereinafter "Mot. Strike Br. Supp."], ECF No. 216.)

[28] (*See* Defs.' Mot. Strike or Preclude Reliance Certain Statements Decl. Luis Gomez 1, ECF No. 215.)

[29] (*See generally* Gomez Decl.)

*v. CSX Transp., Inc.*, 149 F.R.D. 104, 110 (M.D.N.C. 1993) to support their position,[30] but *McCallum* is readily distinguishable. All the employees in that case were current employees of the defendant corporation when their statements were collected. *Id.* at 106–07. By contrast, Gomez retired from Jackson National in 2018, produced his declaration in 2022, and at no point claims to speak for his former employer.[31] The Court therefore rejects this first attack on Gomez's declaration.

24. Defendants also challenge paragraphs 7 and 8 of the declaration on grounds that Gomez lacked personal knowledge of their contents.

25. First, Defendants argue that Gomez's statements that other departments at Jackson National had reviewed and approved the draft contract with rFactr reflect information Gomez learned from others, not his own personal knowledge.[32] But Gomez avers that he was the "point of contact" between Jackson National and rFactr, and in that capacity had personal knowledge of their negotiations.[33] The Court finds this foundation sufficient for Gomez's statements and rejects Defendants' argument.

26. Next, Defendants contend that paragraphs 7 and 8 contain inadmissible hearsay.[34] Hearsay is a an-out-of-court statement offered for its truth. N.C. R. Evid.

---

[30] (*See* Mot. Strike Br. Supp. 2–3.)

[31] (Gomez Decl. ¶ 10.) The Court is also unpersuaded by Defendants' contention that Plaintiffs' counsel obtained the declaration from Gomez, a non-party's unrepresented former employee, in violation of Rule 4.2 of the North Carolina Rules of Professional Conduct. *See* N.C.R.P.C. 81 (permitting an attorney to interview an unrepresented former employee of an adverse corporate party without the permission of the corporation's lawyer).

[32] (Mot. Strike Br. Supp. 6–7.)

[33] (Gomez Decl. ¶ 4.)

[34] (Mot. Strike. Br. Supp. 7.)

801(c).  Nowhere in his declaration, however, does Gomez attempt to state what others at Jackson National told him.[35]  Instead, he bases his statements about the other departments' views on the negotiations with rFactr on his personal knowledge as the "point of contact" and manager of discussions between Jackson National and rFactr.[36]  This underpinning is sufficient to permit the consideration of the declaration on the SJ Motion.  Of course, Defendants are free to point to any alleged weaknesses or inconsistencies in Gomez's testimony at trial, but these potential flaws, outlined at length in Defendants' briefs, do not render the declaration inadmissible.[37]

27.  Finally, the Court concludes that Defendants' argument to exclude paragraphs 7 and 8 under North Carolina Rule of Evidence 403 is without merit. Rule 403 provides that evidence may be excluded, even if relevant, if it creates a risk of "unfair" prejudice.  N.C. R. Evid. 403.  Defendants argue that Gomez's testimony creates unfair prejudice here because Gomez is Plaintiffs' only witness to the status of the contract negotiations.  But this argument is an attempt to recast *unfavorable*

---

[35] (*See generally* Gomez Decl.)

[36] (Gomez Decl. ¶¶ 7–8.)

[37] The Court of Appeals' decision in *S.C. Telecomms. Grp. Holdings v. Miller Pipeline LLC*, 248 N.C. App. 243, 247 (2016), upon which Defendants rely, does not change this result.  In striking contrast to Gomez's personal involvement here, the author of the stricken affidavit in *S.C. Telecomms.* had no personal knowledge or involvement with the relevant events, worked in an entirely unrelated department, and simply parroted the allegations of the plaintiff's complaint.  *See id.* at 248–50 (noting that the affiant was "vice-president of legal affairs" for the plaintiff in a case about subterranean excavation, and that his affidavit consisted "almost entirely" of "verbatim" recitations of the complaint).  These facts are not comparable to the testimony of Gomez, who oversaw the rFactr contract negotiations with Jackson National and thereby acquired personal knowledge of their course.

evidence as *unfair*, which our appellate courts have routinely rejected.  *See, e.g., State v. Godbey*, 250 N.C. App. 424, 438–39 (2016); *Matthew v. James*, 88 N.C. App. 32, 40–41 (1987).  Again, Defendants are free to attack Gomez's credibility at trial, but "damaging to one's case" and "unfair" do not mean the same thing, and the former without the latter does not justify exclusion of evidence under Rule 403.

28.    The Court reaches a different conclusion, however, concerning paragraph 9 of the declaration, in which Gomez avers that Jackson National and rFactr reached a "meeting of the minds" on the terms of a proposed contract.[38]  Decisions in North Carolina and from around the country have held that a statement attesting to a "meeting of the minds" is a legal conclusion,[39] and North Carolina law is clear that "no witness, lay or expert, may testify to a legal conclusion."  *State v. Smith*, 310 N.C. 108, 114 (1984).  The Court thus grants the Motion to Strike as to paragraph 9 and does not consider that portion of the declaration in its decision on the SJ Motion.

---

[38] (Gomez Decl. ¶ 9.)

[39] *See, e.g., Charlotte Motor Speedway, LLC v. Cnty. of Cabarrus*, 230 N.C. App. 1, 6–7 (2013) (stating that the validity of a contract is a legal conclusion, and that one element of validity is a "meeting of the minds"); *see also, e.g., Muth v. Woodring*, No. 1:14-cv-01798, 2015 U.S. Dist. LEXIS 160356, at *40 (M.D. Pa. Nov. 30, 2015) (noting that a statement that there was a "meeting of the minds . . . amounts to nothing more than a legal conclusion"), *rev'd on other grounds*, 666 F. App'x 137 (3d Cir. 2016); *Sias v. Wells Fargo Bank, N.A.*, EP-12-CV-417-PRM, 2013 U.S. Dist. LEXIS 187685, at *10 (W.D. Tex. July 1, 2013) (same); *Gibson v. Mueller*, No. 09-6486-NLH-JS, 2012 U.S. Dist. LEXIS 44853, at *36 n.14 (D.N.J. Mar. 29, 2012) (same); *S. Cent. Steel, Inc. v. McKnight Constr. Co.*, No. CV 105-148, 2007 U.S. Dist. LEXIS 111413, at *22 (S.D. Ga. Jan. 29, 2007) (same); *D'Artagnan, LLC v. Sprinklr Inc.*, 144 N.Y.S.3d 177, 179–80 (N.Y. App. Div. 2021) (same).

C.    Defendants' SJ Motion—the Merits

1.  rFactr's Claim for Tortious Interference with Prospective Economic Advantage Against Both Defendants

29.    Under North Carolina law, a claim for tortious interference with prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701 (2016) (cleaned up).

a.  rFactr's Tortious Interference Claim Against Caroline

30.    Defendant contends that rFactr's tortious interference claim against Caroline should be dismissed because rFactr has failed to show that Jackson National would have contracted with rFactr but for the Call and because rFactr has not demonstrated that the Call caused it any injury.[40]   The Court examines each argument in turn.

31.    First, as to causation, rFactr relies upon the timing of events.  Gomez has testified that at the time Caroline made the Call on 26 October 2017, rFactr and Jackson National had agreed on the prospective contract's materials terms and lacked only a final review by Jackson National's legal department before contract

_____

[40] (Defs.' Br. Supp Mot. Summ. J. Pls.' Affirmative Claims 15–19 [hereinafter "Br. Supp."], ECF No. 204.)

execution,[41] but Gomez emailed rFactr less than 24 hours later, stating that Jackson National had "decided to move in another direction" and was discontinuing further contract negotiations.[42] The Court concludes that this evidence—that Jackson National ended negotiations so soon after the Call when all material terms had been agreed upon and when the contract's execution only awaited final approval from the legal department—is sufficient circumstantial evidence from which a jury could conclude that Caroline's Call caused the negotiations to terminate.[43] Of course, Defendants will be able to challenge this evidence at trial and argue that the negotiations were terminated for other reasons. But the Court concludes that the evidence forecast by rFactr, viewed in the light most favorable to the Company, is sufficient to withstand Defendants' causation challenge on summary judgment.[44]

---

[41] (*See* Gomez Decl. ¶¶ 5–8.)

[42] (Brasser Aff. ¶ 29.)

[43] Courts in North Carolina and numerous other jurisdictions have found that temporal proximity may be sufficient to establish causation. *See, e.g.*, *Atkins v. Town of Wake Forest*, No. COA18-1167, 2019 N.C. App. LEXIS 576, at *7 (N.C. Ct. App. July 2, 2019); *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 47, at *19–20 (N.C. Super. Ct. May 31, 2017) (noting that "a jury could find causal connection" in a wrongful termination action based on temporal proximity); *see also, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Hanson v. Dep't of Nat. Res.*, 972 N.W.2d 362, 374 (Minn. 2022); *Hill v. State*, 448 P.3d 457, 475–76 (Kan. 2019); *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 31 (Tenn. 2011); *Rossova v. Charter Commc'ns, LLC*, 273 A.3d 697, 706 (Conn. App. Ct. 2022); *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 384 (Wash. Ct. App. 2020); *Rustowicz v. N. Broward Hosp. Dist.*, 184 So. 3d 414, 426 (Fla. Dist. Ct. App. 2015); *Purdy v. Wright Tree Serv.*, 835 N.E.2d 209, 213 (Ind. Ct. App. 2005). *But see Young v. Hickory Bus. Furniture*, 353 N.C. 227, 232 (2000) (holding that temporal proximity is not competent evidence of causation in complex medical cases).

[44] Although Defendants argue that a "but for" cause must be the "sole" cause of a plaintiff's injury, (*see* Br. Supp. 16), our courts recognize instead that "[p]roximate cause is a cause

32. Next, Defendants contend that Plaintiffs have failed to identify their alleged damages with specificity, which requires dismissal of Plaintiffs' tortious interference claim.[45] But Plaintiffs have offered evidence that the prospective contract with Jackson National had value to rFactr,[46] and North Carolina law recognizes that nominal damages may be awarded on tortious interference claims. *See, e.g.,* *Lexington Homes, Inc. v. W.E. Tyson Builders, Inc.*, 75 N.C. App. 404, 412 (1985).[47] Thus, Defendants' challenge to Plaintiffs' damages does not provide a basis for summary judgment on Plaintiffs' tortious interference claim against Caroline.

---

which in a natural and continuous sequence produces a person's injury" and thus that "[t]here may be more than one proximate cause of injury;" as a result, our trial courts routinely instruct juries that a "plaintiff need not prove that the defendant's negligence was the sole proximate cause of [a person's] injury [in tort]." *See* 1 North Carolina Pattern Jury Instructions, General Civil § 102.19 (2022) (collecting cases); *Branch Banking & Tr. Co. v. Wilson Cnty. Bd. of Educ.*, 251 N.C. 603, 609 (1960) ("[I]n a tort action the negligence of a private person need not be the sole proximate cause of the injury[.]"); *Badders v. Lassiter*, 240 N.C. 413, 417 (1954) ("Plaintiff's negligence need not be the sole proximate cause of the injury to bar recovery. It is enough if it contribute[s] to the injury as a proximate cause, or one of them.").

[45] (Br. Supp. 18–19.)

[46] (Brasser Aff. ¶ 22; Gentner Aff. ¶ 22.)

[47] The Court recognizes that *Lexington Homes* dealt with a claim of tortious interference with contract, rather than with tortious interference with prospective economic advantage. *See id.* at 409, 412. However, the two forms of tortious interference, with contract and with prospective economic advantage, are closely related and frequently treated alike. *See Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC LEXIS 2, at *28–29 (N.C. Super. Ct. July 10, 2002).

### b. rFactr's Tortious Interference Claim Against Chris

33. Plaintiffs also bring a claim for tortious interference with prospective economic advantage against Chris.[48] Defendants argue that Plaintiffs have failed to produce evidence sufficient to implicate Chris in the Call, which requires dismissal.[49]

34. Under North Carolina law, "[j]oint tort-feasors are those who act together in committing a wrong, or whose acts, if independent of each other, unite in causing a single injury." *Bowen v. Iowa Nat'l Mut. Ins. Co.*, 270 N.C. 486, 492 (1967) (citation omitted). Each tortfeasor must contribute in some way to the plaintiff's injury. *Id.* at 491–92. Therefore, "essential to liability, lies some wrong done by each tort-feasor contributing in some way to the wrong complained of." *Id.* But here, Chris has testified that he had no knowledge or involvement with the Call,[50] and Plaintiffs have produced no evidence to the contrary. Although rFactr argues that Chris's laxity permitted Caroline to gain the information that led her to make the Call to Jackson National, that evidence is insufficient to show that Chris acted in concert with Caroline or otherwise actively participated in making the Call. Accordingly, rFactr's tortious interference claim against Chris must be dismissed.

### 2. rFactr's Breach of Fiduciary Duty Claim Against Chris

35. It is undisputed that as one of rFactr's directors, Chris owed rFactr a fiduciary duty to act in good faith, with due care, and in a manner he reasonably

---

[48] (*See* 2d Am. Compl. ¶¶ 84–88, ECF No. 16.)

[49] (Br. Supp. 15.)

[50] (Chris Aff. ¶¶ 22–23.)

believed to be in the corporation's best interests. *See Green v. Freeman*, 367 N.C. 136, 141 (2013). rFactr contends that Chris breached his fiduciary duty to rFactr by failing to adequately protect rFactr's confidential information from Caroline.[51] The Company argues that Chris knew Caroline had the password to the email account through which he performed his board duties and that he conducted rFactr business on speakerphone when he knew she was within earshot.[52]

36. "A successful claim for breach of fiduciary duty requires proof that (1) the defendants owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Chisum v. Campagna*, 376 N.C. 680, 706 (2021) (quoting *Sykes v, Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019)). Inaction by a corporate director can constitute a breach of fiduciary duty. *See, e.g.*, *Shaw v. Gee*, 2016 NCBC LEXIS 103, at *18 (N.C. Super. Ct. Dec. 21, 2016) (recognizing that a breach of fiduciary duty may injure a plaintiff through the defendant's "wrongful act *or inaction*" (emphasis added)). Similarly, misuse of a company's confidential information can give rise to a breach of fiduciary duty. *See, e.g.*, *Aecom Tech. Corp. v. Keating*, 2012 NCBC LEXIS 9, at *5–6 (N.C. Super. Ct. Feb. 6, 2012) (recognizing a breach of fiduciary duty through misuse of confidential company information); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061–62 (Del. Ch. 2004) (to similar effect); *Leviton Mfg. Co. v. Blumberg*, 660 N.Y.S.2d 726, 728–29 (N.Y. App. Div. 1997) (same).

---

[51] (2d Am. Compl. ¶¶ 97–104.)

[52] (rFactr Opp'n Br. 21.)

37.     It is undisputed that Caroline had access to Chris's email account,[53] and that Chris sometimes held rFactr business calls within her hearing,[54] through which Caroline learned confidential rFactr information.[55]     However, the parties offer conflicting evidence on whether Chris knew of Caroline's activities and whether his acts and omissions breached his fiduciary duty to the Company.     For example, Caroline has testified that she actively concealed her activities from Chris, including by marking Chris's business emails as "unread" after she viewed them so he would not know she had seen them.[56]     Conversely, Chris testified that he was aware that Caroline had the password for his email account, and that she sometimes could overhear his rFactr business calls, which allowed her to learn confidential information.[57]     The degree to which Chris knew the full extent of Caroline's activities, the amount and sort of confidential information she accessed, and the protective measures Chris employed are all disputed.

38.     Similarly, the evidence concerning whether and to what extent Plaintiffs knew Caroline eavesdropped on their business calls is disputed.     While Chris testified that he once told Brasser and Gentner that Caroline and their children were in the car with him during one call and, in conclusory fashion, that Brasser and Gentner

---

[53] (Chris Dep. 11:21–14:1, ECF No. 82.1; Caroline Dep. 146:17–21, ECF No. 82.2.)

[54] (Chris Dep. 14:2–15:4, ECF No. 82.1; Caroline Dep. 129:15–30:12, ECF No. 82.2.)

[55] (Chris Dep. 19:15–21:2, ECF No. 82.1; Caroline Dep. 129:15–30:12, ECF No. 82.2.)

[56] (Caroline Dep. 146:2–13, ECF No. 82.2.)

[57] (Chris Dep. 13:11–15, 20:19–21:2, ECF No. 82.1.)

were sometimes aware that Chris was speaking to them from his house,[58] the Court cannot conclude that this evidence establishes that rFactr knew of or consented to Caroline's presence on their business calls other than the one Chris identified at his deposition.

39. Given this conflicting evidence and its bearing on whether Chris breached his fiduciary duty to rFactr, the Court concludes that Defendants' SJ Motion on this claim must be denied.[59]

### 3. rFactr's UDTPA Claim Against Both Defendants

40. "[T]o establish a *prima facie* claim for unfair trade practices [under N.C.G.S. § 75-1.1], a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656 (2001).

41. rFactr bases its UDTPA claim against Caroline on the Call. Defendants argue that the claim should be dismissed for the same reasons that they contended that rFactr's tortious interference claim against Caroline should be dismissed. But because the Court has now rejected those arguments and intends to permit the tortious interference claim against Caroline to proceed to trial, the Court concludes,

---

[58] (*See* Chris Dep 14:6–19, ECF No. 82.1.)

[59] Defendants argued in their reply brief for the first time that Plaintiff's alleged injuries were not a reasonably foreseeable result of Chris's actions, (Defs.' Reply Br. Supp. Mot. Summ. J. rFactr's Affirmative Claims 4–5, ECF No. 212), so while potentially meritorious, that argument is deemed waived and will have to be raised again at trial. *See* BCR 7.7; *In re Estate of Giddens*, 270 N.C. App. 282, 286 (2020); *see also, e.g.*, *Green*, 367 N.C. at 141 (requiring that a breach of fiduciary duty proximately cause the alleged injury); *Wood v. Carolina Tel. & Tel. Co.*, 228 N.C. 605, 607 (1948) ("*Foreseeable* injury is a requisite of proximate cause[.]" (emphasis added)).

based on the same evidence used to support rFactr's tortious interference, that rFactr has forecasted evidence showing that Caroline engaged in unfair and deceptive trade practices under the UDTPA. *See, e.g.*, *Med1 NC Servs., LLC v. Med1 Plus, LLC*, 2020 NCBC LEXIS 24, at \*32 (N.C. Super. Ct. Feb. 26, 2020) (noting that "a claim for tortious interference with a prospective economic advantage . . . can serve as the basis for a UDTPA claim"). Accordingly, Defendants' SJ Motion on this claim against Caroline shall be denied.

42. rFactr's claim against Chris, however, is subject to dismissal because rFactr has failed to plead that Chris's alleged misconduct was "in or affecting commerce" as required under N.C.G.S. § 75-1.1(a). In that regard, it is undisputed that rFactr has sued Chris solely for the actions he took as a director of the Company, and North Carolina law is clear that "any unfair or deceptive conduct contained solely within a single business is not covered by the [UDPTA]." *White v. Thompson*, 364 N.C. 47, 53 (2010) (barring UDTPA claim between members of a partnership); *see also, e.g.*, *Lafayette Vill. Pub v. Burnham*, 2022 NCBC LEXIS 104, at \*14 (N.C. Super. Ct. Sept. 12, 2022) (barring UDTPA claims between members of an LLC); *Pure Body Studios Charlotte, LLC v. Crnalic*, 2017 NCBC LEXIS 98, at \*25 (N.C. Super. Ct. Oct. 18, 2017) (barring UDTPA claim between corporate directors); *Coleman v. Coleman*, 2015 NCBC LEXIS 114, at \*19–20 (N.C. Super. Ct. Dec. 10, 2015) (barring UDTPA claim by a corporate officer against directors and shareholders). Accordingly, the Court shall grant the Defendants' SJ Motion and dismiss rFactr's UDTPA claim against Chris.

D.    Brasser and Gentner's Slander Per Se Claim Against Both Defendants

43.    Brasser and Gentner base their defamation claim on the statements Caroline made to Jackson National on the Call, alleging that those statements constitute slander per se.[60] "Slander per se is an oral communication to a third party which amounts to . . . an allegation that impeaches the plaintiff in his trade, business, or profession[.]" *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29–30 (2002) (cleaned up).  In an action for slander per se, "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury." *Id.* at 30.

44.    For the claim to survive Defendants' motion, Brasser and Gentner must each bring forward evidence from which a reasonable jury could conclude that (1) Caroline "spoke base or defamatory words which tended to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt;" (2) "the statement was false;" and (3) "the statement was published or communicated to and understood by a third person."  *Donovan v. Fiumara*, 114 N.C. App. 524, 532 (1994) (emphasis omitted) (quoting *West v. King's Dept. Store, Inc.*, 321 N.C. 698, 703 (1988)).  "When examining an allegedly defamatory statement, the court must view the words within their full context[.]" *Boyce & Isley, PLLC*, 153 N.C. App. at 31.  Further, "[w]ith respect to the issue of falsity," the Court must "overlook[ ] minor inaccuracies and focus[ ] on *substantial truth*.  As such, minor inaccuracies do not amount to falsity so long as the substance,

---

[60] (2d Am. Compl. ¶¶ 89–96.)

the gist, the sting, of the [slanderous] charge be justified." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 67 (2020) (cleaned up).

45. Defendants argue that Caroline's statements that rFactr and its owners were in financial trouble, that its CEO was under investigation for arson, and that its owners had withdrawn their children from school and left the country were all true and thus not actionable.[61] The Court addresses each statement in turn.

46. As an initial matter, Caroline's statement that rFactr was in financial distress was about rFactr, not Brasser and Gentner, and thus is not actionable by the individual Plaintiffs. *See, e.g.*, *Arnold v. Sharpe*, 296 N.C. 533, 539 (1979) (requiring that defamatory statements "refer to some ascertained or ascertainable person, and *that person must be the plaintiff*" (emphasis added)).

47. The undisputed evidence also shows that Caroline's statement that Brasser and Gentner were in financial distress was true when made, and thus not defamatory.[62]

48. In addition, Caroline's statement that rFactr's owners had withdrawn their children from school and left the country was true as to Brasser[63] and not defamatory as to Gentner. Indeed, only by interweaving Caroline's statement with "innuendo [or] colloquium" can her statement be understood to prejudice Gentner in his business

---

[61] (Mitchell Dep. 17:6–20:15; Officers' Opp'n Br. 10.)

[62] (Brasser Aff. ¶¶ 11–12; Gentner Aff. ¶¶ 11–12; Chris Dep. 99:23–25, 103:22–04:1, 126:16–27:9, ECF No. 108.1 (referring to Gentner's inability to invest further money in rFactr, and Brasser's resistance to any reduction in his salary because it would render him unable to send his children to a private school).)

[63] (Brasser Aff. ¶¶ 34–35.)

or expose him to disgrace. *See, e.g.*, *Renwick v. News & Observer Publ'g Co.*, 310 N.C. 312, 317 (1984) (noting that defamatory statements must be considered "alone without innuendo, colloquium, or explanatory circumstances"). Accordingly, this statement cannot support Plaintiffs' claim for defamation.

49. The Court reaches a different conclusion, however, concerning Caroline's statement that "rFactr's owners"[64] were under investigation for arson. Defendants argue that rFactr's claim should be dismissed because Caroline reasonably believed her statement was true, and because rFactr has not identified any damages arising from Caroline's statement. But as to the first, Brasser and Gentner have offered evidence from which a jury could conclude that Caroline failed to exercise ordinary care to determine whether her statement was false,[65] and as to the second, North Carolina law is clear that damages are presumed on a claim for slander per se. *Boyce & Isley, PLLC*, 153 N.C. App. at 30. Accordingly, the Court will grant Defendants' SJ Motion on Plaintiffs' defamation claim against Caroline for her statements that rFactr's owners were in difficult financial circumstances and that they had left the

---

[64] Plaintiffs have proffered evidence showing that a reasonable jury could conclude that the person hearing Caroline's statement could ascertain that Brasser and Gentner were "rFactr's owners." *See, e.g., Arnold*, 296 N.C. at 539 ("In order for defamatory words to be actionable, they must refer to some ascertained or ascertainable person and that person must be the plaintiff.").

[65] (*See generally* Officers' Opp'n Br. Ex. 2, Aff. Eric Wall, dated Dec. 19, 2022, ECF No. 209.3 (discussing the Charlotte Fire Department's investigation of the fire, that no fire department personnel ever told Caroline that the Department suspected arson, and denying Caroline's assertion that she learned of an arson investigation from Wall); Aff. Scott Mroz, dated Dec. 21, 2022, ECF No. 211 (to similar effect); Officers' Opp'n Br. Ex. 4, ECF No. 209.5 (showing that Caroline had a telephone conversation of substantial length with Wall only *after* the Call).)

country, but will deny the Motion to the extent the claim rests on her statements that rFactr's owners were under investigation for arson.

50. Brasser and Gentner also assert their defamation claim against Chris. Our courts, however, require a defendant to "take part" in the alleged defamation or "procure or command" the defamatory statement for liability to attach. *Taylor v. Kinston Free Press Co.*, 237 N.C. 551, 552–53 (1953). Brasser and Gentner have failed to offer any evidence that Chris even knew of the Call, much less that he "procure[d] or command[ed]" it. Accordingly, the Court grants this portion of Defendants' SJ Motion and dismisses Brasser and Gentner's slander per se claim against Chris.

IV.

CONCLUSION

51. **WHEREFORE**, for the reasons set forth above, the Court **ORDERS** as follows:

a. Defendants' Motion to Strike is **GRANTED** as to paragraph 9 of the Gomez Declaration but otherwise **DENIED**.

b. The SJ Motion is **GRANTED** as to the following claims, each of which is hereby **DISMISSED** with prejudice:

 i. rFactr's claims against Chris for tortious interference with prospective economic advantage and for violation of the UDTPA; and

 ii. Brasser and Gentner's slander per se claim (i) against Chris and (ii) against Caroline for her statements that rFactr and its owners

were in difficult financial straits and had withdrawn their children from school and left the country.

c. The SJ Motion is **DENIED** as to the following claims, which shall proceed to trial:

i. rFactr's claims against Caroline for tortious interference with prospective economic advantage and for violation of the UDTPA;

ii. rFactr's claim against Chris for breach of fiduciary duty; and

iii. Brasser and Gentner's slander per se claim against Caroline for her statement that rFactr's owners were under investigation for arson.

**SO ORDERED**, this the 27th day of January, 2023.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge